[No. G036587. Fourth Dist., Div. Three. Feb. 28, 2007.]

CHRISTIAN RESEARCH INSTITUTE et al., Plaintiffs and Respondents, v. WILLIAM ALNOR, Defendant and Appellant.

COUNSEL

Ross, Dixon & Bell, Kevin F. Kieffer, Becki F. Kieffer, Jenece D. Solomon; and Peter J. Eliasberg for Defendant and Appellant.

Tom S. Chun for Plaintiffs and Respondents.

OPINION

ARONSON, J.—Defendant William Alnor appeals the trial court's denial of his special motion to strike brought under the anti-SLAPP statute.[1] (Code Civ. Proc., § 425.16.)[2] Alnor contends plaintiffs Hank Hanegraaff and Christian Research Institute (CRI) failed to meet their burden of demonstrating a likelihood of success on their defamation complaint because they failed to show by clear and convincing evidence Alnor's statement about plaintiffs was false or that Alnor acted with malice.

■ We conclude the law does not require a defamation plaintiff to prove falsity by clear and convincing evidence and that plaintiffs have shown by a preponderance of the evidence that Alnor's statements were false. ■ Plaintiffs, however, have failed to demonstrate a probability of prevailing by clear and convincing evidence that Alnor made the challenged statement with "actual malice." We therefore reverse the trial court's order denying Alnor's special motion to strike, and direct the trial court to enter a new order granting the motion and striking the complaint.

I

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Defamation Lawsuit*

Hanegraaff is president of CRI, a nonprofit organization that disseminates religious information. Defendant William Alnor is a former CRI employee who maintains the Christian Sentinel, a Web site reporting on the fundraising and spending practices of various Christian organizations.

Hanegraaff posted an "urgent" letter on CRI's Web site stating that the post office branch in Rancho Santa Margarita had misdirected some of CRI's mail to the wrong address, and that the recipient had discarded some of it. The letter explained that although the local post office branch "has accepted full responsibility for this error and has fixed the problem," the mishap caused

---

[1] SLAPP is an acronym for strategic lawsuit against public participation, first coined by two University of Denver professors. (See Comment, *Strategic Lawsuits Against Public Participation: An Analysis of the Solutions* (1990/1991) 27 Cal. Western L.Rev. 399.)

[2] Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

CRI to lose a substantial amount of money, "perhaps in the hundreds of thousands of dollars." The letter requested readers to "send a sacrificial gift" to CRI to cover the loss. Suspicious of CRI's claims, Alnor called several post office branches to verify the incident. Based on his findings, Alnor published a Christian Sentinel edition disputing CRI's claim that a substantial amount of CRI's mail had been diverted, and questioning the fundraising tactics of Hanegraaff and CRI. Under the heading of "BREAKING NEWS," the edition bore the headline: "Federal Criminal Mail Fraud Investigation Launched Against CRI and Leader Hank Hanegraaff." Under a picture of Hanegraaff, the story began: "Christian Research Institute (CRI) President Hank Hanegraaff has become the focus of a federal criminal mail fraud investigation sparked last week by an unusual 'urgent memo' fundraising appeal letter he released on Friday on CRI's website."

Plaintiffs filed a defamation complaint against Alnor based on his statement that CRI and Hanegraaff were under a federal criminal investigation. Alnor responded with a special motion to strike under the anti-SLAPP statute. In support of the motion, Alnor submitted a declaration outlining his investigation into the CRI memo.

B. *Alnor's Evidence*

According to his declaration, Alnor called the Rancho Santa Margarita office of the United States Postal Service (USPS) and asked to speak to the postmaster. A person who identified himself as " 'Gus,' the 'acting postmaster' " told Alnor he was unaware of the mail diversion discussed in the CRI letter. After providing Gus a copy of the CRI memo, Alnor again called the branch and learned from an unidentified person that the CRI letter had been posted at the facility for the employees to view. This person told Alnor that no one at the facility knew anything about the allegations made in the CRI memo, and that the issue had become a matter of internal investigation. The person also advised Alnor to contact the postal inspector's office in Pasadena, California, so they could start an investigation.

Alnor then called the USPS Pasadena postal inspector's office and spoke to "Debra," who advised Alnor that she was aware of the claims in CRI's memo, and her office was " 'investigating' it on the basis of 'mail fraud.' " Debra asked Alnor to fax her a copy of the CRI memo, and referred him to a Web site where he could file a mail fraud report. Debra explained that all complaints regarding suspected mail fraud were filed with the USPS's national postal inspector's office in Chicago, Illinois. Alnor then printed off, completed, and sent a mail fraud report to both the Rancho Santa Margarita branch and the Chicago postal inspector's office. Alnor subsequently called the Chicago postal inspector's office to ask about the status of his mail fraud

report, and was referred to someone who did not return his ·call. Shortly after Alnor published the allegedly defamatory article, he received a letter from the Chicago postal inspector's office informing him "[t]he information you provided will be reviewed to determine if this matter constitutes any violation of the Mail Fraud or False Representation Statutes."

Alnor spoke on two more occasions with Gus, who said he had received Alnor's mail fraud report and that the postal inspector's office was investigating the situation. Gus said CRI had never complained about diverted mail, and that "[n]o apologies were ever made to CRI." Gus opined the mail diversion outlined in the CRI letter appeared fabricated. Gus told Alnor, "It never happened. There were no diversions of mail." On another call to the Rancho Santa Margarita Post Office, Alnor spoke with an unidentified woman who told him the employees of the office were annoyed over the allegations in the CRI letter and claimed "[CRI] never came in to talk to us at all." She also confirmed that CRI had not filed a complaint regarding the allegedly diverted mail. Alnor also contacted the San Juan Capistrano USPS branch, whose postmaster told Alnor he had never heard of the matters claimed by Hanegraaff in the CRI memo. Alnor attempted to speak with CRI about the matter on several occasions, but the organization would not provide any information.

In addition to his own declaration, Alnor submitted the declaration of Jay Howard, another person who monitors religious organizations. Howard stated that shortly after Alnor published the allegedly. defamatory article, he confirmed with someone named "Mildred" that the post office had initiated a mail fraud investigation based on the CRI. letter. Alnor also ·introduced evidence, including a Los Angeles Times article, to demonstrate plaintiffs' public figure status.

## C. *Plaintiffs' Evidence*

In opposing the special motion to strike, plaintiffs submitted Hanegraaff's declaration. Hanegraaff stated that in the last quarter of 2004, he became aware there had been a noticeable drop in mail volume and the amount of donations received compared with the same period in prior years. In December 2004, CRI received a call from a company named On-Target Marketing (On-Target), a direct mail marketing company which deals with large volumes of mail .daily. The On-Target employee claimed the company had retrieved from its dumpster mail belonging to CRI. Hanegraaff dispatched Paul Young, CRI's chief operating officer, who returned with a full tray of CRI mail from On-Target. Young then met with a USPS official to discuss the situation. CRI decided not to file a formal complaint with the USPS because it did not wish to seek compensation, but only to correct the problem.

Believing the drop in donations occurred because the post office diverted their mail, Hanegraaff prepared and published the CRI letter.

Hanegraaff's declaration states that Alnor had made numerous personal attacks against Hanegraaff, including claims of plagiarism and financial improprieties, since CRI terminated Alnor's employment in 1992. Hanegraaff stated he was aware of only one postal service investigation relating to the CRI memo, which was commenced over a month after Alnor's article. The investigation did not concern any wrongdoing on the part of CRI or Hanegraaff, but focused only on the post office's alleged mishandling of CRI's mail. Plaintiffs included a copy of the post office's investigative report, which confirmed plaintiffs were not targeted.

Plaintiffs also introduced copies of letters received from the Office of Inspector General of the USPS, Federal Trade Commission, and the Federal Bureau of Investigation, in response to CRI's Freedom of Information Act document request; each of the letters stated the agency had no investigative records concerning CRI or Hank Hanegraaff during the preceding two-year period.

## II

### STANDARD OF REVIEW

An order denying an anti-SLAPP special motion to strike is appealable under sections 425.16, subdivision (i), and 904.1. We review the trial court's order de novo. (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999 [113 Cal.Rptr.2d 625].)

## III

### DISCUSSION

A. *Applicable Anti-SLAPP and Libel Principles*

The anti-SLAPP statute provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) An act in furtherance of the right of free speech includes "conduct in furtherance of the exercise of the constitutional right of petition

or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).)

■ "The anti-SLAPP statute arose from the Legislature's recognition that SLAPP suit plaintiffs are not seeking to succeed on the merits, but to use the legal system to chill the defendant's first amendment right of free speech." (*Integrated Healthcare Holdings, Inc. v. Fitzgibbons* (2006) 140 Cal.App.4th 515, 522 [44 Cal.Rptr.3d 517] (*Integrated Healthcare*).) "To prevail on an anti-SLAPP motion, the movant must first make ' "a threshold showing that the challenged cause of action" arises from an act in furtherance of the right of petition or free speech in connection with a public issue.' [Citation.] Once the movant meets this burden, the plaintiff must demonstrate ' "a probability of prevailing on the claim." ' [Citation.] If the plaintiff cannot meet this burden, the trial court must strike the cause of action. [Citation.]" (*Ibid.*)

Plaintiffs concede Alnor's statement arose from constitutionally protected activity, and that the statute's first prong has been met. Thus, the only issue here is whether plaintiffs have demonstrated a probability of success on the merits.

■ "To establish a probability of prevailing, the plaintiff ' "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' [Citation.] In doing so, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant. [Citation.] Although 'the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.' [Citation.] Moreover, the plaintiff cannot rely on the allegations of the complaint, but must produce evidence that would be admissible at trial. [Citation.]" (*Integrated Healthcare, supra*, 140 Cal.App.4th at p. 527.)

Plaintiffs' sole cause of action against Alnor is libel. Civil Code section 45 provides: "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." There is no question the phrase "Federal Criminal Mail Fraud Investigation Launched Against CRI and Leader Hank Hanegraaff" exposes plaintiffs to "hatred, contempt, ridicule, or obloquy," would cause them to be "shunned or avoided," and has a tendency to injure Hanegraaff in his occupation.

■ Plaintiffs do not dispute they are public figures.[3] As such, they have the burden of proving both that the challenged statement is false, and that Alnor acted with " 'actual malice.' " (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 280 [11 L.Ed.2d 686, 84 S.Ct. 710] (*Sullivan*); *Curtis Publishing Co. v. Butts* (1967) 388 U.S. 130, 155 [18 L.Ed.2d 1094, 87 S.Ct. 1975] (plur. opn. of Harlan, J.) [applying *Sullivan* actual malice standard to public figures that are not public officials].) In this context, a defendant acts with " 'actual malice' " when publishing a knowingly false statement or where he "entertained serious doubts as to [its] truth." (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 256 [208 Cal.Rptr. 137, 690 P.2d 610] (*Reader's Digest*).) A public figure plaintiff must prove actual malice by clear and convincing evidence. (*Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 342 [41 L.Ed.2d 789, 94 S.Ct. 2997] (*Gertz*).)

### B. *Plaintiffs Have Met Their Burden to Show Falsity*

#### 1. *Plaintiffs Are Required to Demonstrate Falsity by a Preponderance of the Evidence*

Alnor contends plaintiffs must not only prove malice by clear and convincing evidence, but must also prove falsity by the same standard. In support, Alnor cites *Annette F. v. Sharon S.* (2004) 119 Cal.App.4th 1146, 1170 [15 Cal.Rptr.3d 100] (*Annette F.*). Plaintiffs, citing Judicial Council of California Civil Jury Instructions (2006) CACI No. 1700, contend they are required to prove falsity only by a preponderance of the evidence. We conclude plaintiffs are correct.

In *Annette F.*, the court reversed an order denying an anti-SLAPP motion in part on the plaintiff's failure to prove the falsity of the challenged statement by clear and convincing evidence. (*Annette F., supra*, 119 Cal.App.4th at p. 1171.) *Annette F.* relied solely on the California Supreme Court's decision in *Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1042 [232 Cal.Rptr. 542, 728 P.2d 1177] (*Blatty*). According to *Annette F., Blatty* held that the "plaintiff in [a] case governed by . . . *Sullivan, supra*, 376 U.S. 254 bears [the] burden of proving falsehood by clear and convincing evidence." (*Annette F.*, at p. 1170.) *Blatty*, however, never applied the clear and convincing standard for falsity, nor did it even discuss the issue. Based on the

---

[3] As Alnor points out, CRI bills itself as the "largest, most effective apologetics ministry in the world," receiving over $7 million a year in donations. Plaintiffs also produce "Bible Answer Man," a nationally syndicated daily radio program reaching millions of listeners every week.

pinpoint citation provided, it appears the *Annette F.* court simply misread *Blatty*'s discussion regarding the burdens of proof in defamation actions involving public figures.[4]

■ As plaintiffs correctly note, CACI No. 1700 requires falsity to be proved by a preponderance of the evidence. Pattern jury instructions, however, while designed to accurately reflect the law, are not the law itself. (*People v. Alvarez* (1996) 14 Cal.4th 155, 217 [58 Cal.Rptr.2d 385, 926 P.2d 365].) Some courts have interpreted United States Supreme Court precedent to require proof of falsity by clear and convincing evidence (see, e.g., *Kapiloff v. Dunn* (1975) 27 Md.App. 514, 530–531 [343 A.2d 251]), but the Supreme Court itself has never done so. Indeed, in *Harte-Hanks Communications v. Connaughton* (1989) 491 U.S. 657, 661, fn. 2 [105 L.Ed.2d 562, 109 S.Ct. 2678], the court noted: "There is some debate as to whether the element of falsity must be established by clear and convincing evidence or by a preponderance of the evidence. [Citations.] We express no view on this issue."

■ The requirement that a public figure plaintiff prove malice by clear and convincing evidence arises from First Amendment concerns that freedom of expression be provided "the 'breathing space' that [it] 'need[s] . . . to survive . . . .' " (*Sullivan, supra,* 376 U.S. at p. 272.) Although citing *Annette F.,* Alnor provides no argument why the element of falsity requires a clear and convincing evidence standard to protect freedom of expression. Neither the California Supreme Court nor the United States Supreme Court has expressly mandated this requirement, and we perceive no reason to do so now. Where the law specifies no higher burden of proof, the preponderance of the evidence standard applies. (Evid. Code, § 115.)

---

[4] The portion of the *Blatty* opinion cited by *Annette F.* on burden of proof reads as follows: "At the threshold, in defamation actions—in which, of course, the alleged injurious falsehood of a statement is the gravamen of the plaintiff's claim—the amendment has abrogated the common law of strict liability. (*Gertz v. Robert Welch, Inc., supra,* 418 U.S. at p. 347 . . . .) For constitutional purposes it is not enough that the traditional affirmative defense of truth, with the burden of proof on the defendant, be available to the press; rather it is the plaintiff who is required to plead and prove falsehood. (*Id.* at pp. 339–348 . . . ; . . . *Sullivan, supra,* 376 U.S. at pp. 278–280 . . . ; see, e.g., *Bose Corp. v. Consumers Union of U.S., Inc.* [(1984)] 466 U.S. [485,] 511, fn. 30 [80 L.Ed. 2d 502, 104 S.Ct. 1949] [holding that when the plaintiff is a public official or public figure, in order to carry his burden he must prove 'actual malice'—i.e., he must 'demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement']; *Gertz . . . , supra,* [418 U.S.] at p. 347 . . . [effectively holding that when the plaintiff is a private individual, he must prove that the defendant made the falsehood with at least negligence].)" (*Blatty, supra,* 42 Cal.3d at p. 1042.)

### 2. *Plaintiffs Submitted Admissible Evidence Demonstrating Falsity*

To meet their burden of proving the challenged statement was false, plaintiffs cite to (1) the letters received from federal agencies in response to plaintiffs' Freedom of Information Act (5 U.S.C. § 552) request (FOIA letters); (2) the report from the Office of Inspector General (OIG report); and (3) a Los Angeles Times article submitted by Alnor. Alnor raised hearsay objections to challenge the admissibility of these items.

Plaintiffs contend the FOIA letters and the OIG report fall within the official records exception to the hearsay rule. Evidence Code section 1280 provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or criminal proceeding to prove the act, condition, or event if all of the following applies: [¶] (a) The writing was made by and within the scope of duty of a public employee. [¶] (b) The writing was made at or near the time of the act, condition, or event. [¶] (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

The FOIA letters are authenticated by the declaration of Tom S. Chun, an attorney representing plaintiffs. Chun declares he received the FOIA letters after submitting a written request under the FOIA for "any and all investigative records pertaining to either CRI or Hanegraaff." The FOIA letters each state they were prepared in response to the FOIA request, and identify the time period searched. Each of the letters is dated shortly after the requests were made, and identify the position of the sender. We conclude the official record exception to the hearsay rule has been met.

The OIG report is more problematic. The report contains information which was not directly observable by the investigator who prepared the report, and the investigator identifies no independent sources. Indeed, some of the information in the report appears to have come directly from CRI. For example, the report states: "Beginning in October 2004, CRI began to notice a marked decline in the volume of mail they were receiving. Donations received in October and November of 2004 were down 36.730% compared to donations received in October and November of 2003." Because there is insufficient information to indicate the trustworthiness of the OIG report, we decline to consider it here.

We also conclude the Los Angeles Times newspaper article is hearsay and therefore decline to consider it for its truth. Because Alnor introduced the article, plaintiffs contend he cannot now dispute its accuracy. The record demonstrates, however, Alnor specifically sought judicial notice of "[t]he fact that the Los Angeles Times published the article," and not the truth of its

contents. Because neither Alnor nor plaintiffs sought to introduce the contents of the article for its truth, Alnor did not waive his hearsay objection to the article.

Thus, we are left with the question whether the FOIA letters are sufficient to " ' "sustain a favorable judgment if the evidence . . . is credited." ' " (*Integrated Healthcare, supra*, 140 Cal.App.4th at p. 527.) Alnor contends the letters are unreliable because they did not disclose the investigation of CRI and Hanegraaff prompted by Alnor's complaint. We reject this contention. As noted above, a court may not weigh competing evidence in an anti-SLAPP motion. If the defendant's evidence does not demonstrate that plaintiff cannot prevail as a matter of law, we consider only whether evidence favoring the plaintiff, standing alone, would sustain a judgment in his or her favor. Here, plaintiffs have met their burden to prove falsity because the FOIA letters provide sufficient evidence the USPS did not investigate plaintiffs, contrary to Alnor's claim.

## C. *Plaintiffs Have Not Shown Actual Malice by Clear and Convincing Evidence*

█ Unlike the falsity requirement, plaintiffs must demonstrate "actual malice" by clear and convincing evidence. This requirement presents " 'a heavy burden, far in excess of the preponderance sufficient for most civil litigation.' " (*Hoffman v. Capital Cities/ABC, Inc.* (9th Cir. 2001) 255 F.3d 1180, 1186–1187.) "The burden of proof by clear and convincing evidence 'requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind.' " (*Copp v. Paxton* (1996) 45 Cal.App.4th 829, 846 [52 Cal.Rptr.2d 831] (*Copp*).)

█ To show actual malice, plaintiffs must demonstrate Alnor either knew his statement was false or subjectively entertained serious doubt his statement was truthful. (*Bose Corp. v. Consumers Union of U. S., Inc., supra*, 466 U.S. at p. 511 (*Bose*).) The question is not " 'whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.' " (*Reader's Digest, supra*, 37 Cal.3d at pp. 256–257.)

█ A defamation plaintiff may rely on inferences drawn from circumstantial evidence to show actual malice. (*Reader's Digest, supra*, 37 Cal.3d at pp. 257–258.) "A failure to investigate [fn. omitted] [citation], anger and

hostility toward the plaintiff [citation], reliance upon sources known to be unreliable [citations], or known to be biased against the plaintiff [citations]—such factors may, in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication." (*Id.* at p. 258.) Thus, malice may be inferred where, for example, "a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call." (*St. Amant v. Thompson* (1968) 390 U.S. 727, 732 [20 L.Ed.2d 262, 88 S.Ct. 1323] (*St. Amant*).) Similarly, an inference of malice may be drawn "when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation[,] . . . [or] where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports. [Fn. omitted.]" (*Ibid.*) Conversely, "[t]he failure to conduct a thorough and objective investigation, standing alone, does not prove actual malice, nor even necessarily raise a triable issue of fact on that controversy. [Citations.] Similarly, mere proof of ill will on the part of the publisher may likewise be insufficient. [Citation.]" (*Reader's Digest, supra,* 37 Cal.3d at p. 258.)

Alnor asserts he believed his challenged statement about plaintiffs to be true at the time he made it. To demonstrate this, Alnor relies on his declaration which describes a telephone conversation he allegedly had with "Debra" at the postal inspector's office in Pasadena: "Debra advised me that she was aware of the claims in Hanegraaff's fundraising letter and that her office was 'investigating' it on the basis of 'mail fraud.' " Our analysis of whether plaintiffs have demonstrated actual malice by clear and convincing evidence focuses largely on Alnor's purported conversation with Debra.

### 1. *Fabrication*

As we have noted, malice is shown where "a story is fabricated by the defendant, [or] is the product of his imagination . . . ." (*St. Amant, supra,* 390 U.S. at p. 732.) In the present case, plaintiffs have provided no direct evidence that Alnor fabricated his conversation with Debra. An inference of fabrication can be drawn, however, from the FOIA responses. Specifically, one may reasonably infer from the USPS's inability to locate records of an investigation centering on either of the plaintiffs that no investigation had been launched. From that, one may reasonably infer that Debra in the Pasadena postal inspector's office would not have told Alnor an investigation had been launched, giving rise to the further inference that Alnor either never spoke with anyone named Debra, or that he simply attributed statements to Debra which he knew she never made. Although an inference of malice arises, the issue is whether this inference is " 'sufficiently strong to command the unhesitating assent of every reasonable mind.' " (*Copp, supra,* 45 Cal.App.4th at p. 846.) We conclude it is not.

To demonstrate a probability of prevailing under the anti-SLAPP statute's second prong, the plaintiff must make " 'a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' " (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733].) Thus, in considering whether plaintiffs have met their burden of demonstrating a probability of prevailing on the actual malice issue here, we must determine whether, if credited, their evidence is sufficient to sustain a judgment rendered in their favor by the trier of fact. Reviewing courts must reject challenges to the sufficiency of the evidence if substantial evidence supports the judgment. (See *McMahon v. Albany Unified School Dist.* (2002) 104 Cal.App.4th 1275, 1282 [129 Cal.Rptr.2d 184].) The requirement that a public figure plaintiff demonstrate actual malice, however, calls for a different analysis.

"Normal principles of substantial evidence review do not apply to the appellate court's independent review of an actual malice determination in a First Amendment libel case. [Fn. omitted.]" (*McCoy v. Hearst Corp.* (1986) 42 Cal.3d 835, 846 [231 Cal.Rptr. 518, 727 P.2d 711] (*McCoy*).) "The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by *clear and convincing* proof of 'actual malice.' " (*Bose, supra,* 466 U.S. at p. 511, italics added.) Accordingly, a reviewing "court *is not bound to consider the evidence of actual malice in the light most favorable to respondents or to draw all permissible inferences in favor of respondents.* To do so would compromise the independence of our inquiry. '[T]he constitutional responsibility of independent review encompasses far more than [an] exercise in ritualistic inference granting.' " (*McCoy*, at p. 846, italics added.) Independent review is applied with equal force in considering whether a plaintiff has established a probability of demonstrating malice by clear and convincing evidence in opposing an anti-SLAPP motion. (*Robertson v. Rodriguez* (1995) 36 Cal.App.4th 347, 357–358 [42 Cal.Rptr.2d 464]; see also *Beilenson v. Superior Court* (1996) 44 Cal.App.4th 944, 950 [52 Cal.Rptr.2d 357] (*Beilenson*).)

*Fletcher v. San Jose Mercury News* (1989) 216 Cal.App.3d 172 [264 Cal.Rptr. 699] (*Fletcher*) applied independent review where the evidence supported an inference the defendant fabricated a libelous statement. There, the plaintiff was a city council member and former member of an agency that helped low income persons save money on energy. In a series of published articles, the defendant newspaper and reporter accused the plaintiff of having been involved with Weathermaster, a company attempting to contract with the agency at the same time the plaintiff sat on the agency's board. Recognizing

that the plaintiff had resigned from the agency's board on March 9, the defendants ran an article that quoted, in bold and oversize type, a former Weathermaster salesperson as stating: " ' "There's absolutely no doubt in my mind that [the plaintiff] was involved in Weathermaster before March 1." ' " (*Id.* at p. 181.) At trial, however, the former salesperson testified that "he had 'doubt in my mind' " on whether the plaintiff had been involved with Weathermaster at the time. (*Id.* at p. 188.) This testimony coincided with the reporter's handwritten notes of the salesperson's interview, which quoted the salesman as stating: " ' "There is no, absolutely"—I have "doubt in my mind that [the plaintiff] was involved in Weathermaster before March 1." ' " (*Ibid.*) The reporter, however, testified he accurately quoted the salesperson but inadvertently omitted the word "no" in the second clause of the sentence in his notes. (*Ibid.*) Following a jury verdict awarding damages to the plaintiff, the trial court granted the defendants' motion for judgment notwithstanding the verdict.

On appeal, the plaintiff in *Fletcher* argued the evidence supported the finding of actual malice because the jury could reasonably infer that the defendant fabricated the story because of the discrepancy between the published article and the reporter's notes. The Court of Appeal rejected this argument: "Although the conflict between [the reporter's] notes and what [the reporter] wrote is troubling, we do not think it demonstrates with convincing clarity that [the reporter] believed the allegations against [the plaintiff] were unfounded." (*Fletcher, supra,* 216 Cal.App.3d at p. 188.) The court found it improbable the reporter would have fabricated the quote to support his story because he had obtained information regarding the plaintiff's purportedly improper activities from other sources. (*Id.* at p. 189.) In its independent review of the record, the court acknowledged evidence demonstrating the reporter did not like the plaintiff, and specifically noted that the challenged articles "were less than objective" and "[c]learly" contained factual errors. (*Ibid.*) Nonetheless, the court concluded the plaintiff had failed to provide clear and convincing evidence of malice.

As we noted above, the USPS FOIA response gives rise to an inference Alnor fabricated his conversation with Debra at the Pasadena postal inspector's office. This inference, however, lacks sufficient strength to meet the clear and convincing standard.

For example, the USPS FOIA response does not unequivocally state the USPS has no documents concerning an investigation of either of the plaintiffs, but only that the responder "could not locate any records" of any investigation in her search of the "USPS OIG, Investigations Office and the

Hotline complaint desk . . . ."[5] Thus, the response does not purport to foreclose the possibility that documents pertaining to the investigation Debra mentioned may exist, but are kept in a location other than those searched.

 The USPS FOIA response also does not negate the possibility that Alnor simply misunderstood Debra. Specifically, Debra's statement that "she was aware of the claims in Hanegraaff's fundraising letter and that her office was 'investigating' it on the basis of 'mail fraud,' " was ambiguous. One could reasonably interpret the statement to mean either that her office was investigating whether the purported misdirection of mail described in the CRI fundraising letter constituted mail fraud, or was investigating whether the letter itself constituted mail fraud. Plaintiffs do not contend, and have cited no evidence suggesting, Alnor considered Debra's statement to be the former. Alnor might have carelessly interpreted Debra's statement, but this would not establish malice. "Gross or even extreme negligence will not suffice to establish actual malice; the defendant must have made the statement with knowledge that the statement was false or with 'actual doubt concerning the truth of the publication.' " (*Annette F., supra*, 119 Cal.App.4th at p. 1167.)

We conclude any inference from the USPS FOIA response that Alnor fabricated his conversation with Debra is not sufficiently strong to meet the clear and convincing evidence standard.

### 2. *Slanted Reporting*

We note Debra's representation that her office had initiated an investigation of the CRI letter "on the basis of mail fraud" differs from Alnor's report that plaintiffs were the targets of a "federal mail fraud investigation." We conclude this discrepancy does not demonstrate actual malice.

 The term "mail fraud" is typically used as shorthand for a violation of the federal mail fraud statute, title 18 United States Code section 1341. (See, e.g., *In re Utz* (1989) 48 Cal.3d 468, 473 [256 Cal.Rptr. 561, 769 P.2d 417].) Because plaintiffs originated the letter, they naturally would fall within the scope of any mail fraud investigation. True, Alnor may have deliberately characterized Debra's comments in a light most unflattering to plaintiffs. Slanted reporting, however, does not by itself constitute malice. "Fair and objective reporting may be a worthy ideal, but there is also room, within the protection of the First Amendment, for writing which seeks to expose wrongdoing and arouse righteous anger; clearly such writing is typically less than objective in its presentation." (*Reader's Digest, supra*, 37 Cal.3d at

---

[5] Presumably, "Investigations Office" referred to USPS's national investigation office in Chicago, not its Pasadena office.

p. 259.) Thus, "[a] publisher is 'not required to provide an objective picture [citation] or an accurate one [citation]' [citation]. So long as he has no serious doubts concerning its truth, he can present but one side of the story." (*Id.* at p. 259.)

The present situation is similar to *Annette F.* There, the defendant had published a statement that the plaintiff was a " 'convicted perpetrator of domestic violence.' " (*Annette F., supra,* 119 Cal.App.4th at p. 1167.) The defendant based her statement on an earlier superior court ruling that issued a restraining order and found that the plaintiff had "perpetrated domestic violence" against the defendant. (*Id.* at p. 1156.) The Court of Appeal in *Annette F.* acknowledged that a restraining order was not technically a "conviction." Nonetheless, the court recognized that a lay person might not understand the distinction between a restraining order and a criminal conviction. Consequently, the court concluded that even when considered with such additional factors as evidence of hostility, an alleged motive to discredit the plaintiff, and a lack of investigation, the challenged publication "was not so far from the truth as to permit an inference of actual malice by clear and convincing evidence . . . ." (*Id.* at p. 1170.) The court observed: "At the most, these additional factors raised a speculative possibility that Sharon might have known or suspected that her use of the word 'convicted' was technically incorrect. 'Such a speculative possibility falls short of clear and convincing evidence.' " (*Ibid.*) Accordingly, *Annette F.* reversed the trial court's order denying the defendant's anti-SLAPP motion.

Similarly, any divergence between what Debra told Alnor and what Alnor published demonstrates at most negligence, and therefore it is mere speculation to surmise Alnor knew his statement was false.

### 3. *Alnor's Mail Fraud Report*

Plaintiffs assert Alnor either knew no criminal investigation of plaintiffs existed or harbored doubts that such an investigation existed because he filed a mail fraud report with the Office of Inspector General. Specifically, plaintiffs argue: "Alnor would not have filed [a mail fraud] complaint if he believed that there already was a criminal investigation pending against Respondents. The fact that Alnor tried to start an investigation is strong evidence of Alnor's subjective belief that one did not exist at that time." Although this is a plausible inference, we are not persuaded it is as compelling as plaintiffs contend. An equally reasonable inference is that Alnor filed the report to bolster the existing investigation by providing additional information based on his own research. Absent additional evidence supporting plaintiffs' position, the inference that Alnor's filing of a mail fraud report indicated doubts in his mind about an existing investigation amounts to little more than a speculative possibility.

### 4. *Inadequate Investigation*

Plaintiffs argue Alnor failed to conduct a thorough investigation because Alnor's declaration demonstrates he focused chiefly on whether CRI's mail had been misdelivered, not on the post office's purported investigation of CRI's fundraising letter. Plaintiffs contend Alnor's failure to focus his investigation on the post office's mail fraud investigation concerning CRI demonstrated actual malice. We disagree.

 Actual malice " 'is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.' [Citation.] Lack of due care is not the measure of liability, nor is gross or even extreme negligence." (*McCoy, supra,* 42 Cal.3d at p. 860.) Thus "mere failure to investigate the truthfulness of a statement, even when a reasonably prudent person would have done so, is insufficient" to demonstrate actual malice. (*Annette F., supra,* 119 Cal.App.4th at p. 1169.)

For example, in *Beilenson, supra,* 44 Cal.App.4th 944, an unsuccessful candidate for a congressional seat sued his opponent for libel based on a campaign mailer accusing the plaintiff of unethical behavior for maintaining a private law practice while employed by the state. (*Id.* at p. 947.) The plaintiff argued the defendant "recklessly failed to take any steps to discover" if the plaintiff had violated any law, and demonstrated that a reasonable investigation would have revealed no law had been violated. (*Ibid.*) Nonetheless, the court reversed the trial court's order denying the defendant's anti-SLAPP motion because the plaintiff failed to demonstrate the defendant knew his statement was false, or harbored doubts as to its truth. (*Id.* at pp. 952–953.)

 "To support a finding of actual malice, the failure to investigate must fairly be characterized as ' "the purposeful avoidance of the truth" ' or the ' "product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the subject] charges." ' " (*Rosenaur v. Scherer* (2001) 88 Cal.App.4th 260, 277 [105 Cal.Rptr.2d 674].) In *Antonovich v. Superior Court* (1991) 234 Cal.App.3d 1041, 1052–1053 [285 Cal.Rptr. 863], the defendant charged his political opponent with destroying files. The defendant had no proof of this charge, and failed to investigate after his opponent had offered contrary proof. The court determined that a reasonable trier of fact could conclude the defendant's failure to investigate " 'was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the subject] charges,' " amounting to a " 'purposeful avoidance of the truth' " sufficient to support a malice finding. (*Id.* at p. 1053.) Similarly, in *Khawar v. Globe Internat., Inc.* (1998) 19 Cal.4th

254 [79 Cal.Rptr.2d 178, 965 P.2d 696], the defendant republished information suggesting that the plaintiff had killed Robert Kennedy. The court determined the plaintiff had demonstrated sufficient evidence of malice because the Kennedy assassination "had been painstakingly and exhaustively investigated by both the FBI and state prosecutorial agencies," the only person charged in the shooting was Sirhan Bishara Sirhan, and that "[a]t Sirhan's trial, 'it was undisputed that [Sirhan] fired the shot that killed Senator Kennedy' . . . ." (*Id.* at p. 276.) The court concluded, based on these facts, that there were " ' "obvious reasons" ' " for the defendant to have doubted the accuracy of the information. (*Ibid.*)

Plaintiffs argue Alnor had an obvious reason to doubt the accuracy of the information he received, asserting "[i]t was highly implausible that a criminal investigation would have been launched as of the time [Alnor] had the alleged discussions with the USPS employees." Plaintiffs assert Alnor's suspicions should have been aroused because Debra informed him an investigation was underway on the same day he discovered the fundraising letter. This argument is specious. Plaintiffs presume that any post office investigation would have been launched solely as a result of Alnor's complaints. But the fundraising letter was widely distributed to donors at some unspecified point before Alnor began his inquiry. Thus, there is no evidentiary basis to presume Alnor would have been the only catalyst for a post office investigation.

### 5. *Biased Sources*

Plaintiffs contend Alnor based his statement on biased and unreliable sources because (a) there is no indication that the employees Alnor spoke with held appropriately responsible positions to comment on a mail fraud investigation; (b) Alnor received no indication the employees had any familiarity with the subject; and (c) "it was obvious that any response from the employees would be biased when asked in essence whether they lost CRI's mail." None of these factors is sufficient to demonstrate Alnor doubted the reliability of his sources.

For example, Alnor reached "Debra" by calling the regional postal inspector's office. Her comments demonstrated knowledge of the issue, and she acknowledged her office had launched an investigation into the matter. Although Alnor apparently did not obtain Debra's title or even her last name, there is nothing in the record to indicate Alnor was suspicious of her veracity or doubted her knowledge of the investigation. Moreover, any purported bias by postal employees due to allegations they mishandled CRI's mail would not extend to Debra, whose office apparently had nothing to do with the delivery of CRI's mail. The mere fact that Alnor could have done more to investigate the reliability of his informants is not indicative of malice.

### 6. *Ill Will*

Plaintiffs introduced evidence that Alnor harbored ill will toward them, arising in part from Alnor's purported termination from CRI. Plaintiffs assert that "Alnor's mind was so infected with ill-will, he only saw the worst and the opportunity to spin the situation and create negative publicity for CRI." That Alnor's objectivity and judgment may have been impaired by hostility toward plaintiffs does not by itself demonstrate malice.

A court may consider a defendant's anger or hostility toward a plaintiff in determining the presence of malice only to the extent it impacts the defendant's *actual belief* concerning the truthfulness of the publication. (*Reader's Digest, supra*, 37 Cal.3d at p. 258.) The focus is thus on the " 'defendant's attitude toward the truth or falsity of the material published . . . [not] the defendant's attitude toward the plaintiff.' " (*Id.* at p. 257.) Plaintiffs have not demonstrated any connection between Alnor's alleged ill will toward them and Alnor's belief about the truth of his publication.

We conclude that plaintiffs have not demonstrated Alnor acted with actual malice by clear and convincing evidence. We recognize the actual malice requirement places a substantial barrier to defamation claims brought by a public figure, particularly at this early stage of the proceeding. This barrier, however, was erected in recognition that "erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive . . . .' " (*Sullivan, supra*, 376 U.S. at pp. 271–272.) Our nation's highest court has recognized: "This standard administers an extremely powerful antidote to the inducement to media self-censorship of the common-law rule of strict liability for libel and slander. And it exacts a correspondingly high price from the victims of defamatory falsehood. Plainly many deserving plaintiffs, including some intentionally subjected to injury, will be unable to surmount the barrier of the *New York Times* test. Despite this substantial abridgment of the state law right to compensation for wrongful hurt to one's reputation, the Court has concluded that the protection of the *New York Times* privilege should be available to publishers and broadcasters of defamatory falsehood concerning public officials and public figures." (*Gertz, supra*, 418 U.S. at pp. 342–343.)

The actual malice requirement has been imposed on public officials and public figures in part because such persons "usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." (*Gertz, supra*, 418 U.S. at p. 344.) Plaintiffs' ability to correct the inadvertent errors of a critic, even one as purportedly tenacious as Alnor, is manifest. CRI bills itself as the "largest, most effective apologetics ministry in the world." Plaintiffs produce the nationally syndicated "Bible

Answer Man" radio program reaching millions of people every week, and Hanegraaff has written books and made numerous television appearances. Although uttered in a different context, Justice Brandeis's observation in *Whitney v. California* (1927) 274 U.S. 357, 377 [71 L.Ed. 1095, 47 S.Ct. 641] (conc. opn. of Brandeis, J.) applies here as well: "If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence."

This is not to say one may slander a public figure with impunity. The actual malice barrier, although formidable, is not insurmountable. We note that plaintiffs might have met their burden, for example, by submitting a declaration from an official at the Pasadena postal inspector's office that no one named Debra worked there during the time in question, or a declaration from Debra stating she spoke with Alnor but did not tell him her office was investigating the CRI letter. (See *St. Amant, supra*, 390 U.S. at p. 732 [malice shown where "a story is fabricated by the defendant[ or] is the product of his imagination"].) If evidence from which actual malice may be proven is not readily available, the nonmoving party may, on noticed motion and for good cause, request discovery. (§ 425.16, subd. (g).)

## IV

### DISPOSITION

The order denying Alnor's special motion to strike is reversed, and the trial court is directed to enter a new order granting the motion and striking the complaint. Alnor is to recover his costs on this appeal.

Fybel, J., concurred.

**RYLAARSDAM, Acting P. J.,** Dissenting.—I respectfully dissent.

I wholly agree with my colleagues' legal analysis. But I differ with their application of the law to the facts in this case. My disagreement goes only to the issue of whether plaintiffs have "established a probability that [they] will prevail on the claim . . . ." (Code Civ. Proc., § 425.16, subd. (b)(3); the entire statute will be referred to as the anti-SLAPP statute (strategic lawsuit against public participation) and all further statutory references are to the Code of Civil Procedure.)

Once it is established that the defendant's conduct is protected under the anti-SLAPP statute, the plaintiff is charged with the burden "to make a prima facie showing, by admissible evidence, of facts that would merit a favorable

judgment on those claims . . . . [Citations.] This burden is somewhat akin to that required to resist a nonsuit [citation], or to move for summary judgment. [Citation.]" (*1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 584 [132 Cal.Rptr.2d 789], fn. omitted.) "A plaintiff is not required 'to *prove* the specified claim to the trial court'; rather, so as to not deprive the plaintiff of a jury trial, the appropriate inquiry is whether the plaintiff has stated and substantiated a legally sufficient claim. [Citation.]" (*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 105 [15 Cal.Rptr.3d 215].)

The fact that the test for a "prima facie showing" is identical to the test for summary judgment was reiterated by our Supreme Court in *Taus v. Loftus* (2007) 40 Cal.4th 683. The court stated, "past cases interpreting [the anti-SLAPP statute] establish that the Legislature did not intend that a court, in ruling on a motion to strike under this statute, would weigh conflicting evidence to determine whether it is more probable than not that plaintiff will prevail on the claim, but rather intended to establish a summary-judgment-like procedure available at an early stage of litigation that poses a potential chilling effect on speech-related activities."

Thus, as would be the case if this were a motion for summary judgment, it is our task to determine whether plaintiffs presented sufficient evidence, contradicted or not, to demonstrate the existence of a prima facie case. There is only one element of plaintiffs' cause of action where my colleagues concluded plaintiffs were unable to supply such a demonstration: clear and convincing evidence of actual malice. And this is the only point on which our paths diverge.

Since the same standard applies, I approach my analysis of this case as if defendant had moved for summary judgment under section 437c and we, on de novo review, would determine whether the trial court erred in denying such a motion. Under section 437c, subdivision (p)(2), once defendant had met his initial burden, the burden would have shifted to plaintiffs to demonstrate the existence of evidence raising triable issues of fact. But the court may not grant summary judgment "based on inferences reasonably deducible from the evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact." (§ 437c, subd. (c).) Also, the court may deny summary judgment "where the only proof of a material fact offered in support of the summary judgment is an affidavit or declaration made by an individual who was the sole witness to that fact . . . ." (§ 437c, subd. (e).) And in making our determination, we may consider all evidence, regardless of which party presented it. (§ 437c, subd. (c).)

Now let us examine the evidence relating to the malice element of plaintiffs' claim. I can hardly disagree with my colleagues that we "must

independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.' " (*Bose Corp. v. Consumers Union of U. S., Inc.* (1984) 466 U.S. 485, 511 [80 L.Ed.2d 502, 104 S.Ct. 1949].) Although we are required to engage in de novo review on this issue, we need not draw all inferences favorable to defendant and ignore reasonable inferences favoring plaintiffs. And, in my opinion, when we consider all of the evidence, regardless of who produced it, and draw the possible inferences therefrom, it supports the conclusion that defendant acted with actual malice.

Putting plaintiffs' best case forward and drawing the inferences in their favor, here is what happened: Plaintiffs truthfully advertised the need for additional funds after their mail had been lost due to misdirection. Defendant, motivated by his anger at having been fired by plaintiffs, attempted to embarrass them by asking the post office to conduct a criminal investigation, based on his claim that plaintiffs' advertisement was untruthful and that no mail had been misdirected. The post office failed or refused to do so. Nevertheless, defendant placed notices on his Web site accusing plaintiffs of falsely advertising the loss of mail and asserting that plaintiffs were the subject of a mail fraud investigation.

I stress that I am not here deciding that this is what really happened. But the evidence could support such a conclusion. And such a conclusion would support a finding of malice based on clear and convincing evidence.

As noted by my colleagues, one of the leading cases dealing with the tension between the First Amendment and the law of defamation is *Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244 [208 Cal.Rptr. 137, 690 P.2d 610]. In discussing the de novo standard by which we are to review whether summary judgment should be granted (and the same standard applies here), the court stated: "We recognize a potential chilling effect from protracted litigation as well as a public interest in resolving defamation cases promptly. *That does not mean, however, that a court should grant summary judgment when there is a triable issue of fact as to actual malice.* Instead, courts may give effect to these concerns regarding a potential chilling effect by finding no triable issues *unless it appears that actual malice may be proved at trial by clear and convincing evidence*—i.e., evidence sufficient to permit a trier of fact to find for the plaintiff and for an appellate court to determine that the resulting judgment ' "does not constitute a forbidden intrusion on the field of free expression" ' [citation]." (*Id.* at p. 252, italics added.)

Based on the evidence before us and reasonable inferences that may be drawn therefrom, I am of the opinion that there is "evidence sufficient to permit a trier of fact to find for the plaintiff and for an appellate court to determine that" (*Reader's Digest Assn. v. Superior Court, supra*, 37 Cal.3d at p. 252), if plaintiff prevails, the "judgment ' "does not constitute a forbidden intrusion on the field of free expression" '[citation]." (*Ibid.*)