Filed 3/12/13  Chen v. World Journal LA CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT


| | |
|---|---|
| LEON CHUN-LUNG CHEN, | B237417 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. GC047139) |
| v. | |
| WORLD JOURNAL LA, LLC, et al., | |
| Defendants and Respondents. | |


APPEAL from an order of the Superior Court of Los Angeles County, Jan A. Pluim, Judge.  Affirmed.


Law Offices of Douglas J. Pettibone and Douglas J. Pettibone for Plaintiff and Appellant.


Manatt, Phelps & Phillips, Mark S. Lee, Yi-Chin Ho and Benjamin G. Shatz for Defendants and Respondents.


_____

Appellant Leon Chun-Lung Chen (appellant or Chen) appeals from the order dismissing his First Amended Complaint (the complaint) for multiple defamation-based torts against defendants and respondents World Journal LA, LLC, World Journal SF, LLC and the Chinese Daily News, Inc. (collectively respondents) as a Strategic Lawsuit Against Public Participation (SLAPP). We affirm.

## THE ANTI-SLAPP STATUTE AND STANDARD OF REVIEW

The court in *Hawran v. Hixson* (2012) 209 Cal.App.4th 256 (*Hawran*), recently explained that a special motion to strike pursuant to the anti-SLAPP statute (Code Civ. Proc., § 425.16) " 'is a procedural remedy to dispose of lawsuits brought to chill the valid exercise of a party's constitutional right of petition or free speech. . . . The Legislature has declared that the statute must be "construed broadly" to that end.' . . . [¶] 'The analysis of an anti-SLAPP motion . . . involves two steps. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one 'arising from' protected activity." ' . . . The court looks to ' "the gravamen or principal thrust" of the action.' . . . [¶] ' "[Second, if] the court finds [the threshold] showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim." . . .' . . ." (*Hawran,* at p. 268, citations omitted.)

" 'To establish a probability of prevailing, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." [Citations.] For purposes of this inquiry, "the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant ([Code Civ. Proc.,] § 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." [Citation.] In making this assessment it is "the court's responsibility . . . to accept as true the evidence favorable to the plaintiff . . . ." [Citation.] The plaintiff need only establish that his or her claim has

2

"minimal merit" [citation] to avoid being stricken as a SLAPP.' [Citations.]" (*Hawran, supra*, 209 Cal.App.4th at pp. 273-274.) " ' "Only a cause of action that satisfies both prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning and lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." ' [Citation.]" (*Id*. at p. 269.)

On appeal, we independently review both prongs: whether the complaint arises out of the defendant's exercise of a valid right to free speech, and, if so, whether the plaintiff has established a reasonable probability of prevailing on the merits. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3; *Governor Gray Davis Com. v. American Taxpayers Alliance* (2002) 102 Cal.App.4th 449, 456; *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999.) With these rules in mind, we turn to the facts of this case.

## FACTUAL BACKGROUND

The Chinese Daily News is a Chinese language newspaper. An edition is published by respondent World Journal LA for circulation in the greater Los Angeles, San Diego, New Mexico, and Las Vegas regions; another edition is published by World Journal SF for circulation in Northern California.[1] The Taiwan United Daily News is a Taiwanese newspaper. Taipei Telecommunications Group distributes articles published in the Taiwan United Daily News to other entities, including World Journal.[2] World Journal in turn republishes in the Chinese Daily News those articles World Journal's editors believe would be of interest to its readership. World Journal editors do not verify the accuracy of the information contained in the articles distributed by Taipei Telecommunications Group, much like they do not verify the accuracy of articles distributed by the Associated Press.

---

[1]     We henceforth refer to World Journal LA and World Journal SF collectively as World Journal.

[2]     Neither the Taiwan United Daily News nor Taipei Telecommunications Group is a party to this action.

3

Chen is a dental surgeon. He operates numerous offices in California and Nevada. Chen developed what he characterizes as "ground breaking dental implantation practices, including the patent-pending 'Five in One Technique,' " which allows a patient to receive a full dental implant in one day rather than in five separate procedures over many months. A number of Chen's patients are Chinese-Americans. Since 2007, Chen has advertised his dental practice, as well as seminars he has given on dental implants, in World Journal publications. Chen has also submitted press releases to World Journal. In 2008, Chen gave a copy of his autobiography to the deputy manager of the World Journal LA sales department.

In early 2010, Chen took the Taiwanese dental exam with the intention of extending his dental implantation practice to Taiwan. He did not pass the exam. After failing the exam, Chen gave an interview to Taiwan United Daily News reporter Kuang-I Lee, regarding taking the dental exam and Chen's innovative implant technique. Based on that interview, Kuang wrote an article published in the April 6, 2010 edition of the Taiwan United Daily News under the headline, "Famous Dentist From Harvard Fails Taiwan Medical License Examination." Another article written by Kuang was published that same day under the headline, "Chen Chun-Lung: Are There National Boundaries in Health Care?" After Chen's sister called Kuang to express concerns about the "Famous Dentist" article, Kuang interviewed her and wrote a third article published under the headline, "Was His Clinic Closed Due to Medical Conflicts? Chen Chun-Lung: This Is A Rumor!" Meanwhile, Ching Ru Shih, another reporter with the Taiwan United Daily News, was interviewing prominent dentists in China for an article which was published in the Taiwan United Daily News under the headline, "Different Opinions Toward Dr. Chen Chun-Lung – From Praise to Criticism." Reporter Hui-Hui Chen interviewed a prominent Chinese dentist concerning Chen and contributed one paragraph to that article. In April 2010, Kuang's three articles and the one article co-authored by Ching and Hui, all originally published in the Taiwan United Daily News, were republished in World Journal publications including the local Chinese Daily News. World Journal also posted

the articles on its Web site.[3]  World Journal did not reinvestigate the stories before republishing them in its newspaper or on its Web site.

Chen knew that the articles were published in Taiwan by the Taiwan United Daily News, but did not immediately know they had been republished by World Journal.  After the articles were republished by World Journal, some of Chen's patients refused to pay him for surgeries already performed and lodged complaints against him with the California Dental Board.  At about this same time, Chen noticed a drop in attendance at his seminars.  In September 2010, Chen emailed World Journal requesting that an article about him be removed from its Web site.  In response to the email, the manager of the Web site made the article "non-searchable."

On September 20, 2010, Chen commenced a lawsuit in Taiwan against the Taiwan United Daily News and the Taiwanese journalists who wrote the articles about Chen.  Upon his return from Taiwan on September 29, Chen discovered that the articles appeared not only on World Journal's Web site, but also in the printed Chinese Daily News.  Chen retained an attorney and a translator to translate the Chinese language articles into English.  Over the next several months, Chen's attorney made repeated requests that World Journal print a retraction.  World Journal, through its attorney, refused to do so.

**PROCEDURAL BACKGROUND**

On April 5, 2011, Chen filed this action against respondents for trade libel, libel per se, libel, false light, interference with present and prospective economic advantage, negligent infliction of emotional distress and intentional infliction of emotional distress. Respondents' demurrer to the intentional and negligent infliction of emotional distress causes of action was sustained with leave to amend; their demurrer to the remaining causes of action was overruled.  Chen timely filed the operative first amended complaint, which eliminated the negligent infliction of emotional distress claim.  One article

---

[3]    English translations of the articles are attached as exhibits to the complaint.

published on World Journal's Web site and two articles published in the Chinese Daily News were attached as Exhibits to the amended complaint. The gravamen of the complaint was that the following statements, some repeated in multiple articles republished by World Journal, were false and defamatory:

1. Chen is a "famous dental expert in tooth implantation."

2. Chen "owns eight clinics in the United States . . . ."

3. "[Chen] has an annual income of nearly $500 million in the United States."

4. "Some dentists have disclosed that [Chen's] clinic, located in Las Vegas, has already closed due to medical conflicts." "Those statements regarding 'his clinic located in Las Vegas closed due to medical conflicts,' are totally rumors."

5. "Perhaps it can be said that [Chen] has already felt that there are too many risks with operating his clinic in America, so he has decided to come back to Taiwan for a better career."

6. "[S]ome dentists are suggesting that this [failure to pass Taiwanese dental exam] may be due to his poor Chinese language skills, which may have led to difficulty answering questions."

7. "Although [Chen] wished to come back to Taiwan to start his career, he has to surpass the legal barriers and avoid being the 'famous doctor without a license.' "

8. "[Chen] has already invested money in a clinic located in Taiwan and has prepared this for his nephew who just graduated from the Department of Dentistry in Taiwan."

9. "The Executive Director of the Taiwan Academy of Oral Implantation, Tsai I-Min, once taught [Chen], who was a student of the Department of Dentistry when he was studying periodontal disease at Harvard."

10. "Mr. Tsai still remembers the first question that [Chen] asked him – 'How much do Taiwanese dentists earn?' rather than any dental professional question."

11. Chen never granted an interview to journalists Hui and Ching, whose article states, "[Chen] reported that his original 'five in one' surgical method, . . . can shorten the time for tooth implantation . . . ."

Respondents moved to strike the complaint as a SLAPP.[4] The gist of that motion was that (1) the challenged statements were protected speech, and (2) Chen could not establish a probability of prevailing on the merits of his claims because respondents were immune under the Communications Decency Act of 1996 (47 U.S.C. § 230(c)); the challenged statements were substantially true and not reasonably susceptible of a defamatory meaning and, in any case, Chen could not prove malice. Chen countered that the challenged statements were not protected speech because they were not made in a public forum and were not about a public issue; the Communications Decency Act is inapplicable; the statements were false and defamatory; Chen was not a public figure; and the statements were made with malice.[5]

Following a hearing on August 24, 2011, the trial court granted respondents' anti-SLAPP motion. It found that Chen was a "limited public figure"; most of the challenged statements were "either not false or are not particularly defamatory . . . ," and others are at least partially true . . ."; Chen did not prove malice; and respondents were immune under the Communications Decency Act. The judgment (including an award of attorney fees in an amount to be determined) and order of dismissal were filed on September 16, 2011. Chen timely appealed.

---

**4** Respondents moved to strike the original complaint as a SLAPP, but the record does not include a ruling on that motion.

**5** Chen supported his opposition to the anti-SLAPP motion with a declaration, but did not designate his declaration for inclusion in the clerk's transcript. Even after the absence of his declaration was noted by World Journal in its respondent's brief, Chen did not seek to augment the record with a copy of his declaration. Accordingly, it is not a part of the appellate record. We also observe that the reporter's transcript of the anti-SLAPP hearing is not in the record. We ignore arguments made by appellant that are based on matters outside the record.

7

**DISCUSSION**

*A.      The Challenged Statements Are Protected Speech*

Appellant contends the challenged statements are not protected speech because they were neither made in a public forum nor did they concern a matter of public interest. He is incorrect.

The anti-SLAPP statute provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue" shall be subject to an anti-SLAPP motion. (§ 425.16, subd. (b)(1).) Subdivision (e) of the statute explains that an " 'act in furtherance of a person's right of petition or free speech . . . in connection with a public issue,' " includes any written or oral statement "made in a place open to the public or a public forum in connection with an issue of public interest," as well as "any other conduct in furtherance of the exercise of the constitutional right . . . of free speech in connection with a public issue or an issue of public interest." The statute does not define "public forum" or "public interest."

1.      <u>World Journal's Web Site and the Chinese Daily News Are Public Forums</u>

**a.      The Web Site**

It is now well settled that, "Web sites accessible to the public . . . are 'public forums' for purposes of the anti-SLAPP statute." (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 41, fn. 4; see also *Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1366 (*Wong*).) In *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 897 (*Wilbanks*), the court analogized the World Wide Web to a public bulletin board and the individual web sites to notices pinned to that board. Accordingly, the challenged statements made on World Journal's web site were made in a public forum within the meaning of the anti-SLAPP statute.

8

### b. The Chinese Daily News

The Courts of Appeal have disagreed whether a newspaper is a "public forum" within the meaning of Code of Civil Procedure section 425.16, subdivision (e). For example, in *Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 863, fn. 5, the court held that newspapers are not public forums because members of the public cannot freely publish their opinions in them. (See also *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1130 ["Means of communication where access is selective, such as most newspapers, newsletters, and other media outlets, are not public forums."].)

But other courts have concluded otherwise "because the opinions [that newspapers and magazines] express are readily available to members of the public and contribute to the public debate." (*Nygård, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1037 (*Nygård*).) The court in *Nygård* reasoned that nothing in the anti-SLAPP statute suggests that the Legislature intended to exclude traditional print media from anti-SLAPP protection and the purpose of the statute would not be served if it were construed to be inapplicable to all newspapers, magazines and other public media. (*Nygård,* at p. 1038; see also *Wilbanks, supra,* 121 Cal.App.4th at p. 897 ["Where the newspaper is but one source of information on an issue, and other sources are easily accessible to interested persons, the newspaper is but one source of information in a larger public forum."]; *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 476 [homeowners' association newsletter was a public forum "in the sense that it was a vehicle for communicating a message about public matters to a large and interested community"].) We agree with the reasoning of *Nygård*, *Damon* and *Wilbanks*, and conclude that newspapers are public forums within the meaning of Code of Civil Procedure section 425.16, subdivision (e). Accordingly, the challenged statements made in articles published in the World Journal-owned Chinese Daily News were made in such a forum.

2.    The Statements Concern an Issue of Public Interest

To come within the anti-SLAPP statute, a statement must also be made "in connection with an issue of public interest." (Code Civ. Proc., § 425.16, subd. (e).) Statements that are in the nature of consumer protection information satisfy this criterion. For example, in *Carver v. Bonds* (2005) 135 Cal.App.4th 328 (*Carver*), a podiatrist sued the publisher of a newspaper for statements in an article that suggested he exaggerated his experience treating famous athletes to market his practice. The appellate court affirmed dismissal of the action as a SLAPP, reasoning that the statements of fact and opinion in the article were consumer protection information. (*Id.* at pp. 343-344; see also *Wong, supra*, 189 Cal.App.4th 1354 [posting on Yelp Web site criticizing dentist involved a matter of public interest]; *Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 23 (*Gilbert*) [statements made on Web site created by a patient in which she criticized her plastic surgeon were about a matter of public interest].)

But the anti-SLAPP statute does not protect only statements made about *significant* issues, such as consumer protection. In *Nygård*, the court held that, " 'an issue of public interest' within the meaning of [Code of Civil Procedure] section 425.16, subdivision (e) is *any issue in which the public is interested*. In other words, the issue need not be 'significant' to be protected by the anti-SLAPP statute—it is enough that it is one in which the public takes an interest." (*Nygård, supra,* 159 Cal.App.4th at p. 1042.) The defendants in *Nygård* were the plaintiff's former employee and a Finnish magazine to which the employee gave an interview in which he disparaged his former employer. The employer sued the employee and the magazine for defamation. The appellate court affirmed the order striking the complaint as a SLAPP, based on evidence that there "was 'extensive interest' in Nygård—'a prominent businessman and celebrity of Finnish extraction'—among the Finnish public. Further, defendants' evidence suggests that there is particular interest among the magazine's readership in 'information having to do with Mr. Nygård's famous Bahamas residence which has been the subject of much publicity in Finland.' The June 2005 article was intended to satisfy that interest." (*Id.* at p. 1042; see

10

also *Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 807-808 [comments on a radio show about a contestant on the "Who Wants To Marry A Multimillionaire" television program were made in connection with an issue of public interest within the meaning of the anti-SLAPP statute].)

Here, the evidence established that Chen operated a number of dental offices in California and Nevada, many of his patients were Chinese-Americans, he promoted himself as the inventor of a unique dental procedure, he submitted press releases about himself to World Journal, he wrote an autobiography which he distributed to people, and he hoped to expand his practice to Taiwan but he failed the Taiwanese dental exam. Under the reasoning of *Nygård*, Chen was the subject of public interest at a minimum in the Chinese-American community, much like Nygård was a subject of public interest among the Finnish population. And under *Carver*, the opinions of other dentists about Chen and his unique implant technique, as well as inferences to be drawn from the fact he failed the Taiwanese dental exam, are in the nature of consumer protection information and, as such, were matters of public interest.

## B. *Chen Has Not Shown a Probability of Success on the Merits*

We next turn to the second step of the analysis – whether Chen has established a probability of prevailing on the merits. After addressing evidentiary issues that necessarily frame our analysis, we conclude that Chen has not made the requisite showing.

### 1. The Challenged Evidentiary Rulings

#### a. **The Blanket Evidentiary Rulings**

In support of its motion, World Journal submitted declarations of its attorney and 10 employees, all of which are included in the appellate record. In opposition to the motion, Chen submitted his own declaration, which is not part of the record on appeal (and the declaration of expert witness John Miller, which we discuss in the next part).

11

Chen contends the trial court abused its discretion in making the following blanket evidentiary ruling: "[World Journal's] hearsay and relevan[ce] objections to the Chen declaration are sustained. [Chen's] objections to [World Journal's] evidence are overruled." We disagree.

We generally review trial court evidentiary rulings for abuse of discretion. (*Twenty-Nine Palms Enterprises Corp. v. Bardos* (2012) 210 Cal.App.4th 1435, 1447 (*Twenty-Nine Palms*).) Even under that standard, the erroneous admission or exclusion of relevant evidence cannot be the basis of a reversal unless the error resulted in a miscarriage of justice. (Evid. Code, §§ 353, 354; *San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1419 [exercise of discretion in admitting or excluding evidence will not be disturbed " 'except on a showing that the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice . . . .' "].)

Summarily ruling on numerous evidentiary objections has become a common and efficient practice in law and motion courts. (*Twenty-Nine Palms, supra,* 210 Cal.App.4th at p. 1447.) In *Cole v. Town of Los Gatos* (2012) 205 Cal.App.4th 749, 764, fn. 6, the court held: "[W]here a trial court is confronted on summary judgment with a large number of nebulous evidentiary objections, a fair sample of which appear to be meritless, the court can properly overrule, and a reviewing court ignore, all of the objections on the ground that they constitute oppression of the opposing party and an imposition on the resources of the court." By contrast, in *Twenty-Nine Palms*, also an appeal from a summary judgment, the court criticized the practice, holding that a blanket ruling sustaining all objections to the appellant's evidence without reasoning was an abuse of discretion given "the problematic nature of some of the objections" in that case. (*Cole, supra,* at p. 1449; see also *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 255 [blanket ruling on 763 out of 764 objections was an abuse of discretion where some of the objections did not assert a basis for the objection; others were to the opposing party's brief, not his evidence; others were to matters clearly within the party's knowledge such

12

as his religion, skin color and national origin; others were simply frivolous].)  However, the *Twenty-Nine Palms* court found the error harmless because there was no reasonable probability that the result would have been more favorable to the appellant in the absence of the error.  (*Twenty-Nine Palms,* at p. 1449.)

Here, we need not decide whether the practice of blanket rulings on numerous evidentiary objections was in and of itself an abuse of discretion.  Chen has not argued the merits of each individual objection or categories of objections and has not shown that any evidence was improperly excluded or admitted.  Fundamentally, without a copy of Chen's declaration in the appellate record, we are not able to review any of the objections sustained by the trial court.  Accordingly, he has not shown the requisite miscarriage of justice – i.e., that he would have obtained a more favorable result had the trial court ruled on each objection individually.

### b. Miller's Declaration

In support of his opposition to the anti-SLAPP motion, Chen submitted the purported declaration of John Miller, a professor emeritus in the School of Journalism at Ryerson University in Toronto, Canada.  The trial court sustained respondents' objection to Miller's declaration on the ground that it did not comply with Code of Civil Procedure section 2015.5 (section 2015.5), which requires that a declaration executed outside of California state "that it is so certified or declared *under the laws of the State of California.*"  (Italics added; see also *Kulshrestha v. First Union Commercial Corp.* (2004) 33 Cal.4th 601, 605 (*Kulshrestha*) ["Section 2015.5 specifies that a declaration must *either* reveal a 'place of execution' within California, or recite that it is made 'under the laws of the State of California.' "].)[6]  Chen challenges this ruling.  We find no error.

---

[6] Subdivision (b) of section 2015.5 suggests the exact language to include over the signature line of a declaration executed outside of California:  "I certify (or declare) under penalty of perjury of the laws of the State of California that the foregoing is true and correct."  We note that the Miller document also did not comply with California Rules of Court, rule 2.108 because it was not double or one and one-half spaced, and the lines were not consecutively numbered.

13

The purpose of section 2015.5 "is to streamline the oath or affirmation procedure in order to hold one legally responsible for information given in an official document. [Citation.] The statute eliminates many of the technicalities and formalities which made prosecutions for perjury difficult." (*People v. Flores* (1995) 37 Cal.App.4th 1566, 1572-1573 (*Flores*).) Under some circumstances, failure to comply with section 2015.5 has been found to be a harmless, technical error. (See, e.g., *Flores,* at pp. 1573-1576 [where preprinted driver's license form executed in California stated, "I hereby certify under penalty of perjury under the laws of the State of California," the form substantially complied with § 2015.5 notwithstanding perjury defendant's failure to indicate the place he executed the form].) But our Supreme Court has held that *out of state* declarations that do not comply with section 2015.5 are "not deemed sufficiently reliable for purposes of that statute, unless they follow its literal terms." (*Kulshrestha, supra*, 33 Cal.4th at p. 611 [declaration executed in Ohio and signed under penalty of perjury was not admissible to support a motion for summary judgment because it did not certify that the contents were true "under the laws of the State of California"].)

Here, the following phrase appears above Miller's signature on the last page of the document: "I declare under penalty of perjury that the foregoing is true and correct. [¶] Sworn this 15th day of August in Port Hope, ON, Canada." Inasmuch as Miller's declaration was executed in Canada, the failure to certify or declare that it was executed "under penalty of perjury under the laws of the State of California" was a fatal defect and the trial court properly sustained respondents' objection to it on that ground.

We turn next to the merits of Chen's defamation-based claims as limited by the trial court's rulings on the Chen and Miller declarations.

14

## 2.     Chen Is a Public Figure

The complaint alleges causes of action for trade libel, libel per se, libel and false light.  Each of these torts is a species of defamation.[7]  In addition to having to prove that the challenged statements are false (which we discuss in greater detail in the next section), a public figure plaintiff must prove by clear and convincing evidence that the defendant acted with actual malice when he or she uttered the statements.  (*Gilbert, supra*, 147 Cal.App.4th at p. 26; see also *Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 76 (*Christian*).)  We agree with World Journal that Chen is at least a limited public figure.

*Gilbert* is instructive.  In that case, Gilbert sued her plastic surgeon, Sykes, for malpractice.  Gilbert had also created a Web site on which she discussed plastic surgery in general, and expressed her dissatisfaction with Sykes in particular.  Sykes filed a multi-tort cross-complaint against Gilbert alleging he was defamed as a result of false statements Gilbert made on her Web site.  The trial court denied the anti-SLAPP motion, finding that Sykes established a probability of prevailing on the merits of his cross-complaint.  The appellate court reversed.  Among other things, it found Sykes to be an "archetypical example of a 'limited purpose' or 'vortex' public figure," and therefore he had the burden of proving that the statements made on Gilbert's Web site were both false

---

[7]     As relevant here, libel is "a false and unprivileged [written] publication . . . , which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."  (Civ. Code, § 45.)  Libel per se is "[a] libel which is defamatory of the plaintiff without the necessity of explanatory matter . . . ."  (§ 45a.)  For libel per se, the test is not whether a written statement can only be reasonably viewed as defamatory, but whether it is reasonably susceptible of a defamatory meaning on its face.  (*MacLeod v. Tribune Publishing Co.* (1959) 52 Cal.2d 536, 549; see also *Wong, supra*, 189 Cal.App.4th at p. 1372 [statements can be libelous despite the possibility of an innocent, nondefamatory interpretation].)  Trade libel "encompasses 'all false statements concerning the quality of services or product of a business which are intended to cause that business financial harm and in fact do so.' [Citation.]"  (*ComputerXpress, Inc. v. Jackson, supra,* 93 Cal.App.4th at p. 1010.)  The elements of a "false light" claim are a false, defamatory, unprivileged communication that has a tendency to injure or cause special damage.  (*Hawson, supra*, 209 Cal.App.4th at p. 277.)

and published with actual malice. (*Gilbert, supra*, 147 Cal.App.4th at pp. 17-18, 25.) The court explained that, to characterize a defamation plaintiff as a limited purpose public figure, " 'the plaintiff must have undertaken some voluntary act through which he or she sought to influence resolution of [a] public issue. In this regard it is sufficient that the plaintiff attempts to thrust him or herself into the public eye. And finally, the alleged defamation must be germane to the plaintiff's participation in the controversy.' [Citation.]" (*Id*. at p. 24.) The court found Sykes had affirmatively placed himself into the controversy over the relative merits of plastic surgery by writing articles in medical journals and beauty magazines, appearing on local television shows "touting the virtues of cosmetic and reconstructive surgery," testifying as an expert witness on the subject and advertising his services in the local media. (*Id*. at p. 25.) It was not necessary to show that Sykes actually achieved some level of prominence in the public debate; it was sufficient that he attempted to thrust himself into the public eye. (*Ibid*.)

Here, World Journal introduced into evidence printed pages from Chen's Web site promoting his dental practice, his new "five-in-one" implant technique, and seminars he has given on that technique. Chen's Web site describes him as "world renowned" and lists the accolades Chen has received for his work. World Journal also introduced a number of ads and press releases Chen placed in Chinese language publications touting his expertise. Finally, World Journal introduced a portion of Chen's autobiography, a copy of which he gave to a World Journal employee.

As in *Gilbert*, the evidence that Chen promoted himself as the inventor of a unique dental implant technique, advertised his services and seminars which he gave on his new technique in the local media, distributed press releases about himself and wrote an auto-biography which he distributed, provide compelling proof that Chen undertook affirmative action to create and influence a public controversy – the merits of the traditional dental implant method versus his new technique. As such, he was a limited public figure and had to show by clear and convincing evidence that World Journal acted with actual malice to demonstrate a probability of prevailing on his defamation-based claims.

16

3. Chen Has Not Shown That World Journal Acted With Actual Malice

A libel defendant acts with malice when he or she knowingly publishes a false statement, or a statement as to which he or she entertained a serious doubt as to its truthfulness. (*Christian, supra*, 148 Cal.App.4th at p. 81.) The test is not whether a reasonably prudent man would have published, or would have investigated before publishing. " ' "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." [Citation.] Lack of due care is not the measure of liability, nor is gross or even extreme negligence.' [Citation.] Thus 'mere failure to investigate the truthfulness of a statement, even when a reasonably prudent person would have done so, is insufficient' to demonstrate actual malice." (*Id*. at p. 90.)

As we explain in the next part, Chen has not established that the challenged statements are provably false or defamatory. But even if he had done so, the record is devoid of any showing that World Journal knew they were false or entertained a serious doubt as to their truthfulness.

4. Chen Has Not Shown That the Challenged Statements Are False or Defamatory

Although distinct torts, trade libel and defamation are similar in that both impose liability for publication to third parties of a false statement. (*Polygram Records, Inc. v. Superior Court* (1985) 170 Cal.App.3d 543, 549; see also *Gilbert, supra*, 147 Cal.App.4th at p. 27 [no recovery for defamation without a falsehood].) " '[T]o state a defamation claim that survives a First Amendment challenge, plaintiff must present evidence of a statement of fact that is *provably false*. [Citation.] "Statements do not imply a provably false factual assertion and thus cannot form the basis of a defamation action if they cannot ' "reasonably [be] interpreted as stating actual facts" about an individual.' [Citations.] Thus, 'rhetorical hyperbole,' 'vigorous epithet[s],' 'lusty and imaginative expression[s] of . . . contempt,' and language used 'in a loose, figurative

17

sense' have all been accorded constitutional protection. [Citations.]" [Citation.] The dispositive question . . . is whether a reasonable trier of fact could conclude that the published statements imply a provably false factual assertion.' [Citation.]" (*Gilbert, supra*, at p. 27.) Unlike the clear and convincing proof required for actual malice, a defamation plaintiff need only show *falsity* by a preponderance of the evidence to overcome an anti-SLAPP motion. (*Christian, supra*, 148 Cal.App.4th at p. 76.)

To recover for defamation arising out of a news report, the plaintiff "must establish that the news report was false, defamatory, and unprivileged, and that it had a natural tendency to injure or that it caused special damage. [Citations.] In response to an anti-SLAPP motion, however, [the plaintiff's] burden of proof is admittedly low, requiring that she introduce substantial evidence of each element on which an ultimate verdict in her favor could be affirmed." (*Young v. CBS Broadcasting, Inc.* (2012) 212 Cal.App.4th 551, 559.) If the "substance, the gist, the sting of the libelous charge" is justified, a "slight inaccuracy in the details will not prevent a judgment for the defendant, if the inaccuracy does not change the complexion of the affair so as to affect the reader of the article differently . . . [Citations.]" (*Gilbert, supra*, 147 Cal.App.4th at p. 28.)

Although a publication must contain a false statement of fact, not opinion, before it may be deemed libelous (*Campanelli v. Regents of University of California* (1996) 44 Cal.App.4th 572, 578 (*Campanelli*)), a defamatory statement which is couched as an opinion but which may be understood as a factual assertion is actionable. (*Moyer v. Amador Valley J. Union High School Dist.* (1990) 225 Cal.App.3d 720, 723, fn. 1, 725-726 [statements in a high school student newspaper that the plaintiff, a teacher at the school, was a "babbler" and the "worst" teacher at the school were nonactionable opinions].)

"[W]hether a statement is reasonably susceptible to a defamatory interpretation is a question of law for the trial court." (*Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 647.) Likewise, whether an allegedly defamatory statement is either fact or opinion is a question of law. (*Campanelli, supra*, 44 Cal.App.4th at p. 578.) Courts look to the totality of the circumstances to assess the natural and probable effect of the statement on

18

the average reader.  The court must go beyond the language itself, however, and " 'look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed.'  [Citation.]"  (*Ibid*.)

Based on the appellate record in this case, and in light of the above cited authorities, we cannot say that the challenged statements are false.  Because Chen's declaration attesting to the falseness of the challenged statements is not in the appellate record, there is no evidence in the record that the statements are false.  Thus, Chen has failed to show the requisite probability of success on the merits of his claims to overcome an anti-SLAPP motion.

Even if we accept some evidentiary basis for Chen's challenge to the truth of each of the challenged statements, we are not persuaded that the trial court was wrong in its conclusion that the challenged statements are each either not demonstrably false, a matter of opinion, not defamatory or a combination of the three things:

- o The characterization of Chen as "famous" is a matter of opinion.  Even if it were a statement of fact, it is not reasonably susceptible of a defamatory interpretation – i.e., an interpretation that would expose Chen to hatred, contempt, ridicule, or obloquy, or cause him to be shunned or avoided, or tend to injure Chen in his occupation.  (See Civ. Code, § 45 ["Libel is a false and unprivileged publication by writing, . . . which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."].)

- o The statement that Chen had to surpass legal barriers to be able to practice dentistry in China is not false –there is no dispute that Chen had to pass the Taiwanese dental exam before he could practice there.  Pairing that statement with the second clause of the sentence – to "avoid being the famous doctor without a license" – does not transform the statement into a falsehood.  The gist of the statement was essentially true – Chen had to pass

19

the Taiwanese dental exam in order to practice in Taiwan. In any case, the statement is not reasonably susceptible of a defamatory interpretation.

- The suggestion that "some dentists are suggesting" that Chen "may" have failed the Taiwanese dental exam because of his poor Chinese language skills is a statement of opinion, not fact. Even if Chen's Chinese language skills were not the reason that he failed, the gist of the statement – that he failed the exam – is accurate. (See *Gilbert, supra*, 147 Cal.App.4th at p. 28 [a "slight inaccuracy in the details will not prevent a judgment for the defendant, if the inaccuracy does not change the complexion of the affair so as to affect the reader of the article differently . . ."].)

- The statements that Chen owns eight clinics in the United States and has an annual income of $500 million are not reasonably susceptible of a defamatory interpretation, even if inaccurate, because the gist of the statement is true: Chen is a successful dentist and owns a number of clinics in the United States.

- The statements that (1) "Tsai I-Min, once taught [Chen], who was a student of the Department of Dentistry when he was studying periodontal disease at Harvard" and (2) "Mr. Tsai I-Min still remembers the first question that [Chen] asked him – 'How much do Taiwanese dentists earn?' rather than any dental professional question," are not reasonably susceptible of a defamatory interpretation, even if not true.

- The statement that Chen's Las Vegas clinic closed "due to medical conflicts" is not reasonably susceptible of a defamatory interpretation because the phrase "medical conflicts" is so ambiguous as to have almost no meaning.

- The statement, "Perhaps it can be said that [Chen] has already felt that there are too many risks with operating his clinic in America, so he has decided to come back to Taiwan for a better career," is speculation, not a statement of fact.

20

o The statement that Chen had already invested money in a clinic in Taiwan is not false; Chen challenges only the statement that he "prepared [this clinic] for his nephew who just graduated from the Department of Dentistry in Taiwan." Instead, Chen maintains he "merely trained his nephew in his patented 'Five-in-One' surgical method/technique." Even if untrue, this statement is not reasonably susceptible of a defamatory interpretation.

o The statement "[Chen] reported . . ." in the article written by journalists Hui and Ching, is not false because it does not state (or even suggest) that Chen made any statement directly to them. Reporters may report based on sources other than the object of the story. In other words, the hearsay rule does not apply to newspapers. There is no dispute that Chen maintained his dental implant technique would shorten the time to complete an implant. The fact that Chen may never have been interviewed by these journalists does not establish that anything in their article was defamatory.

Because none of the challenged statements is reasonably susceptible of a defamatory interpretation, none can support a defamation-based cause of action and Chen has failed to establish a likelihood that he will prevail on the merits of his claims for trade libel, libel per se, libel, and false light.

5. Interference With Economic Advantage and Intentional Infliction of Emotional Distress

Chen's fifth cause of action for interference with economic advantage and sixth cause of action for intentional infliction of emotional distress are both based on the same acts upon which his first through fourth causes of action are based – the allegedly false and defamatory statements described above. In *Gilbert, supra*, 147 Cal.App.4th 13, the court held that the collapse of the plaintiff's defamation claim spelled the demise of all other causes of action which arose from the same publication, including intentional and negligent interference with economic advantage and intentional infliction of emotional distress. (*Id.* at p. 34, quoting *Fellows v. National Enquirer, Inc.* (1986) 42 Cal.3d 234,

21

245[" ' "to allow an independent cause of action for the intentional infliction of emotional distress, based on the same acts which would not support a defamation action, would allow plaintiffs to do indirectly what they could not do directly. It would also render meaningless any defense of truth or privilege" ' "].) Under *Gilbert*, the loss of Chen's first through fourth causes of action carries with it his fifth and sixth causes of action, as well.

## C.     *The Communications Decency Act*

Inasmuch as we have found that Chen has not shown a reasonably probability of prevailing on the merits of his claims for other reasons, we need not decide whether his claims are also barred by the Communications Decency Act.

## D.     *The Order Awarding Attorney Fees*

Because we affirm the order dismissing the complaint as a SLAPP, we need not address Chen's contention that reversal of the order requires reversal of the attorney fee award.

### DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.


RUBIN, J.

WE CONCUR:


BIGELOW, P. J.


FLIER, J

22