Filed 9/17/19

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ALAN HICKS, | D074274 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2018-00005119-CU-DF-CTL) |
| DAMIAN RICHARD, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Ronald L. Styn, Judge.  Reversed and remanded with directions.

Greene & Roberts, Maria C. Roberts, Michael W. Healy; Niddrie Addams Fuller Singh and Rupa G. Singh for Defendant and Appellant.

LA Superlawyers and William W. Bloch for Plaintiff and Respondent.

I

INTRODUCTION

Damian Richard appeals from an order denying in part his special motion to strike Alan Hicks's complaint for defamation and intentional infliction of emotional distress.

The complaint arose from Richard's role in prompting the Diocese of San Diego (Diocese) to remove Hicks from his school principal position.[1]

Richard contends we must reverse the part of the court's order denying his anti-SLAPP motion because, among other reasons, the court erred in deciding the common interest privilege did not apply to bar Hicks's claims.  We agree with this contention.  Accordingly, we reverse the order and remand the matter to the court with directions to vacate the order, to enter a new order granting the motion and striking Hicks's complaint, and to determine the amount of attorney fees and costs to award Richard under section 425.16, subdivision (c)(1).

II

BACKGROUND

A

1

Hicks was a principal of a Catholic elementary and middle school.  Richard was the husband of one the school's teachers and a parent of children who attended the school.

---

[1]     The motion was filed under Code of Civil Procedure section 425.16.  (Further undesignated statutory references are also to this code.)  Section 425.16 applies to Strategic Litigation Against Public Participation (SLAPP)—litigation intended primarily to chill a person's exercise of constitutionally protected free speech or petition activity. (*FilmOn.com v. DoubleVerify, Inc.* (2019) 7 Cal.5th 133, 143 (*FilmOn*).)  Section 425.16 is commonly known as the anti-SLAPP statute and a motion brought under section 425.16 is commonly referred to as an anti-SLAPP motion.  (E.g., *FilmOn*, at pp. 139–140.)

According to Richard, Hicks asked Richard to serve on the school's advisory board for the 2015-2016 school year. At an advisory board meeting in the fall of that school year, Hicks informed the advisory board he wanted to allow the producers of a television show to film the show on the school's campus. Richard expressed his belief the school should not be affiliated with the show because the show was intended for mature audiences due to its sexual nature and conduct.

At a fundraiser in the spring of that same school year, Hicks revisited the topic with Richard. During their discussion, Hicks said he had previously permitted a motorcycle dealership to use the school's campus for a photoshoot and had received complaints because of the pornographic nature of the photographs taken.

Later in the summer, Hicks asked Richard to serve as the chair of the advisory board for the 2016-2017 school year and Richard accepted the post. In that role and during that school year, Richard received complaints from parents, teachers, and other board members about Hicks. The complaints included concerns about Hicks's poor leadership, mismanagement of the school, frequent inappropriate comments to and about students and female staff, and advocacy for a curriculum Richard and other parents did not believe was in the best interest of the students or the school.

In the winter of the 2016-2017 school year, the advisory board investigated the complaints, which were corroborated by employees and parents. Richard and the other parents, referring to themselves as "Members of the 2016-2017 Advisory Board," sent a letter and a chart discussing the information they received to the bishop of the Diocese,

3

the Diocese's director for schools, and a bishop with the Archdiocese of Los Angeles who was also the president of one of the school's accrediting organizations.

The letter faulted Hicks in four areas. First, the letter stated Hicks was not following the protocols of the school's accrediting organizations. Specifically, the letter stated in the spring of 2016, during a post-accreditation meeting of the school's advisory board, Hicks repeatedly refused to disclose the accrediting organizations' report. Hicks also had not convened another advisory board meeting in the subsequent 10 months, contrary to the collaborative approach recommended by and promised to the accrediting organizations.

Second, the letter alleged Hicks made inappropriate comments, created a hostile work environment, and exercised poor judgment. As examples of making inappropriate comments and creating a hostile work environment, the letter stated Hicks "recently made the following statements in the presence of female faculty members at the School, and in some instances, either in front of children or toward children: 'she's like a dog;' 'nice legs;' 'look at her hips;' 'I don't give a shit;' 'he looks like [a] pervert (directed at an elementary student);' 'you are too fat to be a model (directed at a middle school girl),' and 'it is a shame you are having a girl (stated twice, directed at a pregnant staff member, and stated in the presence of female School employees).' " The letter also stated Hicks had commented on a female teacher's breast size in the presence of another teacher and had stated his hiring philosophy consisted of hiring attractive female teachers.

As examples of exercising poor judgment, Hicks purportedly required a group of middle school boys to receive a period of instruction from him on the topic of

4

masturbation without first notifying and obtaining parental approval. He also discharged a physical education teacher because she refused to act more submissive to him. Then, he falsely suggested to parents and other teachers that she was mentally unstable.

In addition, he allowed a local motorcycle dealership to use the school's campus to film and photograph bikini-clad women while school children were present for summer camp. Copies of some of the photographs were appended to the letter. When a female staff member complained about the matter to parish and Diocese officials, Hicks discharged her.

Third, the letter alleged the school's academic standards were declining under Hicks's leadership because he required teachers to emphasize instruction in literature, art, music, and poetry and deemphasize instruction in science and math. The letter further lamented Hicks's failure to release recent standardized test scores to parents and noted past standardized test scores showed math deficiencies. The letter also claimed Hicks did not conduct teacher evaluations and professional development consisted of "requiring the faculty to read poetry, watch ballet, and listen to classical music for hours on end." The letter additionally claimed, "Hicks administers by intimidation, causing a general lack of communication among teachers and parents" and "students with special needs are often not identified formally or properly and teachers and their aids are often unaware of such needs."

Fourth and finally, the letter asserted Hicks was not properly addressing bullying, abuse, and child safety issues at the school. The letter stated teachers, students, and parents had noticed an increase in unaddressed bullying and student-to-student physical

contact, including recent incidents of one second grade student repeatedly striking another second grade student and later the same week choking yet another student. The letter also recounted an unaddressed incident in which a teacher sat on top of a second grade student as a form of punishment.

The letter then referenced allegations of child abuse committed by priests at a former school where Hicks was headmaster, indicating "it is important to mention them here because similar patterns of inaction and indolence with [Hicks's] leadership are surfacing." The letter included a footnote directing the letter's recipients to Internet sources of information about the allegations and Hicks's purported role in failing to protect the children at the school.

The Diocese investigated the information. After its investigation, the Diocese removed Hicks from his position as principal.

2

According to Hicks, he had been the principal of the school for almost 10 years before he was discharged. During that time, the parish priest who hired him and oversaw the school indicated numerous times he was doing a superior job. In addition, the chair of the accreditation committee that visited the school in the winter of 2016 described the school as having a positive and enriching environment, noted the school community had nothing but good to say about Hicks, and found widespread satisfaction among the school's teachers with the workplace, the administration, and the school's progress. Four months later, one of the Diocese's financial auditors referred to the school as a model school.

Hicks contends the letterhead used to convey the allegations to the Diocese, which referenced a school advisory board, was self-created and fake.

Hicks believes the letter was motivated by malice because Richard's wife, who was a first-year teacher at the school during the 2016-2017 school year, had problems with the mentors Hicks had assigned to help and mentor her in the classroom.[2]

B

Hicks sued Richard alleging claims for defamation and intentional infliction of emotional distress. As factual support for these claims, Hicks alleged Richard falsely stated in the letter that:

1.    Hicks remarked to children, or in the presence of children and female faculty members, "she's like a dog"; "look at her hips"; "I don't give a shit"; "he [an elementary school student] looks like [a] pervert"; and "you [a female middle school student] are too fat to be a model."

2.    Hicks required a group of middle school males to be instructed by him about masturbation.

3.    Hicks approved the use of school property as a setting for a photo shoot of bikini-clad women on motorcycles and fired a female staff member who complained about the activity to parish and Diocesan officials.

---

[2]    Hicks's complaint did not reference Richard's wife's difficulties in its allegations of malice.

4. Hicks lowered the school's academic standards by trying to reduce math and science instruction.

C

Richard filed an anti-SLAPP motion, asserting Hicks's complaint arose out of conduct in furtherance of Richard's right of free speech in connection with a public issue and Hicks could not show a probability of prevailing on the merits of his claims. Hicks opposed the motion, arguing the converse.

The court granted the anti-SLAPP motion in part and denied it in part. The court found Richard established Hicks's claims against Richard arose from constitutionally protected free speech in connection with a public issue or an issue of public interest. (§ 425.16, subd. (e)(4).) However, the court found Hicks had established minimal merit to his claims to the extent they were based on allegations Hicks made inappropriate remarks to students and female staff members, discussed masturbation with male students, allowed a motorcycle store to conduct a salacious photo shoot on school premises, and was principal of a boarding school at a time when priests were alleged to have sexually abused students.[3] The court further found Hicks had established minimal merit to his claim the common interest privilege did not apply by supplying evidence Richard's wife was having employment issues as a teacher at the school and,

---

[3] Hicks's complaint did not reference the boarding school statements as a basis for either of its causes of action.

8

consequently, the letter may have been motivated by Richard's hatred or ill will toward Hicks.[4]

## III

## DISCUSSION

A plaintiff's claim against a defendant is subject to an anti-SLAPP motion if the claim arises from the defendant's act in furtherance of the defendant's federal or state constitutional right of petition or free speech in connection with a public issue and the plaintiff has not established a probability of prevailing on the claim. (§ 425.16, subd. (b)(1).) We review an order granting or denying an anti-SLAPP motion de novo. (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067.)

Resolution of an anti-SLAPP motion "involves a two-step process. First, the moving defendant must make a prima facie showing 'that the act or acts of which the plaintiff complains were taken "in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue," as defined in the statute.' [Citation.] If the defendant makes this initial showing of protected activity, the burden shifts to the plaintiff at the second step to establish a probability it will prevail on the claim. [Citation.] The plaintiff need only state and substantiate a legally sufficient claim. [Citation.] The plaintiff's evidence is accepted as true; the defendant's evidence is evaluated to determine if it defeats the plaintiff's

---

4     As Hicks did not appeal the court's decision, the only issues before us in this appeal are those related to statements for which the court denied Richard's anti-SLAPP motion. (See *Taus v. Loftus* (2007) 40 Cal.4th 683, 711–712 (*Taus*).)

9

showing as a matter of law.  [Citation.]  The procedure is meant to prevent abusive

SLAPP suits, while allowing 'claims with the requisite minimal merit [to] proceed.' "

(*City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 420; see *Barry v. State Bar of

California* (2017) 2 Cal.5th 318, 321.)

A

Regarding the first step of the anti-SLAPP motion analysis, the parties dispute

whether the letter was "conduct in furtherance of the exercise of ... the constitutional right

of free speech in connection with a public issue or an issue of public interest."  (§ 425.16,

subd. (e)(4).)  Resolving this dispute requires a two-part analysis.  "First, we ask what

'public issue or [ ] issue of public interest' the speech in question implicates—a question

we answer by looking to the content of the speech.  (§ 425.16, subd. (e)(4).)  Second, we

ask what functional relationship exists between the speech and the public conversation

about some matter of public interest."  (*FilmOn, supra*, 7 Cal.5th at pp. 149–150.)[5]

There must be " 'some degree of closeness' between the challenged statements and

the asserted public interest."  (*FilmOn*, *supra*, 7 Cal.5th at p. 150.)  " '[I]t is not enough

that the statement refer to a subject of widespread public interest; the statement must in

some manner itself contribute to the public debate.' "  (*Ibid.*)  "We are not concerned with

the social utility of the speech at issue, or the degree to which it propelled the

conversation in any particular direction; rather, we examine whether a defendant—

---

5       Although the California Supreme Court decided *FilmOn* after this appeal was fully
briefed, the parties both submitted letters analyzing the case and inviting us to apply it to
this appeal.

10

through public or private speech or conduct—participated in, or furthered, the discourse that makes an issue one of public interest." (*Id.* at p. 151.) In conducting this examination we consider "context—including audience, speaker, and purpose." (*Id.* at p. 152.)

Here, there is little question the letter implicates issues of public interest, including providing school children with an appropriate education and protecting them and school employees from abuse, bullying, and harassment. (See, e.g., *Grenier v. Taylor* (2015) 234 Cal.App.4th 471, 483 [character and fitness of a church leader is a matter of public interest within the church community]; *Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 465–468 [child safety and suitability of adults working with children are matters of public interest]; *Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1547–1548 (*Terry*) [protecting children from predators and protecting children in church youth programs are matters of public interest].) Instead, the crux of the parties' dispute at this step of the anti-SLAPP motion analysis is whether the letter contributed to the public debate, or furthered the discourse, on these issues. We think it did.

The letter was the result of an inquiry conducted by concerned parents, irrespective of their status as a school advisory body. The letter was transmitted to authorities outside the school and the local parish, namely the bishop of the Diocese, the Diocese's director of schools, and the bishop of the Archdiocese of Los Angeles who was also the president of one of the school's accrediting organizations. The letter was intended to prompt these outside authorities to investigate and act on the allegations

11

contained within it.  The letter ultimately served this purpose, although the parties dispute the appropriateness of the outcome.  Accordingly, we conclude the letter was protected activity under subdivision (e)(4) of the anti-SLAPP statute.  (See *Terry*, *supra*, 131 Cal.App.4th at p. 1546 ["subdivision (e)(4) applies to private communications concerning issues of public interest"].)

B

Regarding the second step of the anti-SLAPP motion analysis, Hicks's burden was similar to that of a party opposing a motion for summary judgment.  He had to demonstrate his claims were both legally sufficient and supported by evidence that, if credited, would be sufficient to sustain a favorable judgment.  (*Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 695.)  Richard asserts Hicks did not and cannot meet this burden because, among other reasons, the common interest privilege applies to the letter.  Hicks asserts the common interest privilege does not apply because Richard acted with malice when he made the statements in the letter.  We agree with Richard.

The common interest privilege applies to a communication made without malice to a person interested in the communication's subject matter by another person also interested in the communication's subject matter.  (Civ. Code, § 47, subd. (c)(1).)  "Ordinarily, the common interest of the members of a church in church matters is sufficient to give rise to a qualified privilege to communications between members on subjects relating to the church's interest."  (*Brewer v. Second Baptist Church* (1948) 32 Cal.2d 791, 796 (*Brewer*).)  This reasoning applies by analogy to communications between parents of parochial school children and church authorities overseeing the school

12

on subjects relating to the school.  (See Rest.2d Torts, § 596 ["The common interest of members of religious, fraternal, charitable or other non-profit associations, whether incorporated or unincorporated, is recognized as sufficient to support a privilege for communications among themselves concerning the qualifications of the officers and members and their participation in the activities of the society"].)  Thus, the common interest privilege applies to the statements in the letter unless the statements were made with malice.  (*Brewer*, at p. 797; *Hailstone v. Martinez* (2008) 169 Cal.App.4th 728, 740 (*Hailstone*) [if malice is shown, the common interest privilege never arises; if malice is not shown, the privilege is a complete defense to all torts except malicious prosecution]; *Noel v. River Hills Wilsons, Inc.* (2003) 113 Cal.App.4th 1363, 1368–1369 (*Noel*) [same].)

The malice required to defeat the common interest privilege is actual malice. (*Kachlon v. Markowitz* (2008) 168 Cal.App.4th 316, 336.)  Such malice cannot be inferred from the letter itself.  (*Hailstone*, *supra*, 169 Cal.App.4th at p. 740; Civ. Code, § 48.)  Rather, Hicks had to show either that the letter was motivated by Richard's hatred or ill will toward Hicks or that Richard lacked reasonable grounds for believing the truth of the statements in the letter.  (*Kachlon*, at p. 336; *Noel*, *supra*, 113 Cal.App.4th at p. 1370.)

Here, Hicks sought to show the letter was motivated by Richard's hatred or ill will toward him by producing e-mail evidence indicating Richard's wife was experiencing problems with her employment as a teacher at the school.  While this evidence may tend to show Richard disliked Hicks, it is not sufficient by itself to show the statements in the

13

letter were made with malice. (See *Taus*, *supra*, 40 Cal.4th at p. 721 [defendant's acknowledged displeasure with an ethical complaint plaintiff filed against defendant is not sufficient to show defendant acted with malice in making challenged statements about plaintiff]; *Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 248 (*Reader's Digest*) [mere proof of ill will on the part of the person making statements may not be sufficient to raise a triable issue of material fact on the question of whether the person made the statements with malice]; *Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 85 (*Christian Research*) [same].)

"A court may consider a defendant's anger or hostility toward a plaintiff in determining the presence of malice only to the extent it impacts the defendant's *actual belief* concerning the truthfulness of the publication. [Citation.] The focus is thus on the ' "defendant's attitude toward the truth or falsity of the material published ... [not] the defendant's attitude toward the plaintiff." ' " (*Christian Research*, *supra*, 148 Cal.App.4th p. 92, citing and quoting *Reader's Digest*, *supra*, 37 Cal.3d at pp. 257, 258; *Live Oak Publishing Co. v. Cohagan* (1991) 234 Cal.App.3d 1277, 1292 [a defendant's ill will toward a plaintiff is not itself "actual malice"; "actual malice" requires a link between the defendant's ill will and the defendant's awareness of the probable falsity of the challenged statements].)

Here, Hicks has not provided any evidence linking Richard's alleged ill will toward Hicks and Richard's belief about the truth of the statements in the letter. There is no evidence Richard was openly hostile to Hicks, threatened retaliation, or engaged in similar vengeful conduct. (See, e.g., *Brewer*, *supra*, 32 Cal.2d at pp. 798–799; *Mamou v.*

14

*Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 729–731.)  There is also no evidence Richard disbelieved or had reason to disbelieve any of the statements in the letter.  (See *Reader's Digest*, *supra*, 37 Cal.3d 244, 257–258 [malice requires some evidence of failure to investigate, anger and hostility toward the plaintiff, use of unreliable or biased sources, or similar conduct indicating the person making the statements had serious doubts about their truth]; *Christian Research*, *supra*, 148 Cal.App.4th at pp. 84–85 [same]; *Emde v. San Joaquin County Cent. Labor Council* (1943) 23 Cal.2d 146, 161 [no evidence statements were made with malice when the statements furthered a legitimate purpose and there was no indication the party who made the statements disbelieved them].)

Likewise, there is no indication of malice in the tenor or manner in which the statements in the letter were made.  (*Brewer*, *supra*, 32 Cal.2d at p. 799 [the tenor of a statement may be evidence of malice and the manner of a statement may be evidence of malice if the facts the defendant believed to be true were exaggerated, overdrawn, or colored to plaintiff's detriment]; *Dietrich v. Litton Industries, Inc.* (1970) 12 Cal.App.3d 704, 714 [the language of a statement may be evidence of the motive of the person making the statement].)  The letter was written in a businesslike manner and the statements within it were supported by a chart specifying Hicks's concerning remarks or behavior, when the remarks or behavior occurred, who witnessed the remarks or

15

behavior, and a means for contacting the witness(es).[6] Further, the statements in the letter regarding the conduct occurring at the out-of-state school where Hicks previously worked were supported by quotes from and Web site locations for articles about the conduct and Hicks's role in failing to prevent or address it.

Absent evidence Richard acted with malice, Hicks cannot establish the common interest privilege did not apply to the statements in the letter. Consequently, he cannot establish a probability of prevailing on the merits of his claims and the court should have granted Richard's anti-SLAPP motion in full.

Given the preceding conclusions, we need not decide the remaining issues raised or alluded to on appeal, including whether Hicks can establish the statements in the letter were false, whether certain of Hicks's claims are barred by the federal Communications Decency Act of 1996 (see 47 U.S.C., § 230), whether the court erred in its rulings on the parties' evidentiary objections, and whether the parties had forfeited appellate review of any claims or contentions. We also need not decide Richard's opposed motion for judicial notice.

IV

DISPOSITION

The order is reversed. The matter is remanded to the superior court with directions to vacate its order granting in part and denying in part Richard's anti-SLAPP

---

[6]     The witnesses' names and contact information were redacted from the copy of the chart included in the record. Nonetheless, we were able to determine from the copy of the chart that the chart included this information.

motion, to enter a new order granting the motion and striking Hicks's complaint, and to determine the amount of attorney fees and costs to award Richard under section 425.16, subdivision (c)(1).  Richard is awarded his appeal costs.

McCONNELL, P. J.

WE CONCUR:


BENKE, J.


AARON, J.